## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KELLY CHINEA AND JULIO CHINEA, as Parents and Natural Guardians of S.C., a minor, | No. 4:22-CV-00134 |
| Plaintiffs, | (Chief Judge Brann) |
| v. | |
| WOODWARD PENNSYLVANIA, LLC F/K/A POWDR - WOODWARD CAMPS, LLC, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

### DECEMBER 13, 2022

Plaintiffs Kelly and Julio Chinea, on behalf of their minor daughter, S.C., sue Woodward Pennsylvania, LLC ("Woodward"), the gymnastics camp their daughter attended in the summers of 2018 and 2019. They also sue two former Woodward employees: Woodward's then-administrator, Brittany Shulman, and the Woodward gymnastics coach who allegedly abused her, Nathaniel Singer.

The Chineas' First Amended Complaint raises allegations of reprehensible conduct. The Chineas allege that during the summers of 2018 and 2019, Singer sexually abused their daughter. They further allege that Shulman was aware of Singer's improper behavior. When S.C. complained to Shulman about Singer in

2019, Shulman brought her into a conference room, interrogated her, challenged her credibility, and made veiled threats about her future.

Woodward and Shulman now move to partially dismiss two Counts of the Chineas' First Amended Complaint ("FAC"). Woodward also seeks the dismissal of several corporate entities named as defendants who it argues have no connection to this matter. For the reasons that follow, Defendants' Motions to Dismiss will be granted in part and denied in part.

## I.    BACKGROUND

### A.    The Underlying Facts

Singer began working at Woodward[1] in 2016 as a coach and disc jockey.[2] Shulman served as Woodward's camp administrator and Singer's supervisor.[3] Throughout 2016, Singer violated Woodward's policies several times by "isolating minor female campers, including taking them alone on golf cart rides and being alone with them in the D.J. booth."[4] He also "pursued an intimate relationship with a female minor camper" who served as one of Woodward's junior counselors.[5] At one point, he snuck the junior counselor "out of her cabin in the middle of the night and sexually abused her" on Woodward property.[6]

---

[1]   The Chineas have sued seven entities that either currently operate or previously operated the Woodward camp. Six of these entities have no involvement in this matter and are accordingly dismissed from this matter entirely, as is explained below.

[2]   First Amend. Compl. ("FAC"), Doc. 5 ¶ 27.

[3]   *Id.* ¶ 15.

[4]   *Id.* ¶ 29.

[5]   *Id.* ¶ 31.

[6]   *Id.* ¶ 32.

Woodward rehired Singer for the 2017 camp, and subsequently learned of his violations of camp policy when another staff member reported Singer's conduct to Shulman.[7] Singer admitted to his sexual contact with the junior counselor.[8] With Shulman's involvement, Woodward again hired Singer for the summer of 2018.[9] The same Woodward employee who expressed concern in 2017 suggested to Shulman that Singer's contact with minor campers be limited, but Shulman refused to do so.[10]

During the summer of 2018, thirteen-year-old S.C. attended Woodward's gymnastic camp for two weeks.[11] Singer was one of her coaches.[12] During the second week, Singer inappropriately touched S.C.'s buttocks while spotting her during her gymnastics routines, and at one point slipped his finger into her vagina.[13] S.C. did not report Singer's actions to anyone at Woodward in 2018.[14]

Again with Shulman's involvement, Woodward hired Singer for 2019.[15] The employee who reported Singer's behavior in 2018 again told Shulman she was concerned about Singer's continued employment at Woodward.[16] "Shulman stated

---

[7]   *Id.* ¶¶ 33-34, 36.
[8]   *Id.* ¶ 35.
[9]   *Id.* ¶¶ 38-39.
[10]  *Id.* ¶ 40.
[11]  *Id.* ¶ 42.
[12]  *Id.* ¶¶ 13, 49.
[13]  *Id.* ¶¶ 44-45.
[14]  *Id.* ¶ 46.
[15]  *Id.* ¶¶ 47-48.
[16]  *Id.* ¶ 49.

that she was fine with Singer working at the camp despite his past 'mistakes'" and permitted him to coach minors without restriction.[17]

S.C., now fourteen years old, returned to Woodward in 2019 for one week, and Singer was again assigned as her coach.[18] He again inappropriately touched S.C.'s buttocks while spotting her and slipped his finger into her vagina.[19] S.C. remarked to Singer that his spotting technique was "weird."[20] Singer claimed that was his normal procedure for that drill.[21] Later that week, Singer again slipped his finger into S.C.'s vagina while spotting her.[22] On two other occasions in 2019, Singer attempted to corner S.C. in a hallway and close the door, but S.C. was able to open the door and leave the room.[23] She then reported Singer's behavior to the head coach, who reported it to Shulman.[24] S.C. then relayed her concerns to Shulman.[25]

Shulman and another staff member brought S.C. into a conference room alone.[26] They then "interrogated S.C. about the report of abuse, challenged her credibility, and advised her not to ruin Singer's reputation and to stop spreading rumors."[27] "They also threatened that if she continued to talk about Singer's assault

---

[17] *Id.*
[18] *Id.* ¶ 50.
[19] *Id.* ¶¶ 51-52.
[20] *Id.* ¶ 53.
[21] *Id.*
[22] *Id.* ¶ 54.
[23] *Id.* ¶¶ 55-56.
[24] *Id.* ¶¶ 57-58.
[25] *Id.* ¶ 59.
[26] *Id.* ¶ 60.
[27] *Id.*

that it would wreck her chance of being a gymnast in college."[28] Due to Singer's abuse and Woodward's response, S.C. now suffers from a variety of mental and emotional conditions and trauma which have also manifested physically.[29]

### B.    Procedural History

The Chineas first filed suit in Centre County Court of Common Pleas in December 2021.[30] In January 2022, Woodward removed the case to this Court on the basis of diversity jurisdiction.[31] The Chineas moved to remand the case back to state court, relying on the forum-defendant rule and their inclusion of several defendants either incorporated in or with their principal place of business in Pennsylvania.[32] The Court denied their motion, concluding that the four Pennsylvania-based defendants were both fraudulently joined and not properly served.[33]

Following the Court's denial of their motion to remand, the Chineas amended their complaint.[34] In the FAC, the Chineas name Shulman, Singer, and a set of corporate entities that includes Woodward as defendants.[35] The FAC alleges that: Woodward and Shulman were negligent in failing to supervise Singer (Counts I and II); Woodward and Shulman negligently hired Singer for the 2018 and 2019 summer

---

[28]  *Id.*
[29]  *Id.* ¶ 71.
[30]  May 19, 2022 Mem. Op. and Order, Doc. 22 at 1.
[31]  *Id.* at 2.
[32]  *Id.* at 2-3
[33]  *Id.* at 3-5.
[34]  *See* FAC, Doc. 5.
[35]  *See id.*

camps (Count III); Woodward is vicariously liable for Singer's tortious actions (Count IV); Singer's actions constitute assault and battery of S.C. (Count V); and Shulman and Woodward's response to S.C.'s allegations constitute intentional infliction of emotional distress ("IIED") (Count VI).[36]

Woodward and Shulman now move to partially dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6).[37] Specifically, Woodward seeks dismissal of Counts IV (vicarious liability) and VI (IIED); Shulman seeks dismissal of only Count VI.[38] Woodward also seeks the dismissal of six corporate entities named as Defendants for insufficient service of process.[39] The Court will interpret Woodward's arguments regarding service as a motion made under Rule 12(b)(5). All motions have been fully briefed and are ripe for disposition.[40]

## II.   LAW

### A.   Rule 12(b)(5)

Rule 12(b)(5) permits dismissal of a party's pleading based on the party's failure to properly serve the correct target.[41] Rule 4 sets forth the requirements for serving parties with pleadings in federal court, but it expressly allows parties to use

---

[36]  *Id.*

[37]  Shulman MTD, Doc. 26; Woodward MTD, Doc. 27.

[38]  Shulman MTD, Doc. 26 ¶ 11; Woodward MTD, Doc. 27 ¶ 11.

[39]  Woodward MTD, Doc. 27 ¶ 15.

[40]  *See* Shulman Br., Doc. 28; Woodward Br., Doc. 29; Chinea Opp. Brs., Docs. 32-33; Shulman Reply, Doc. 35; Woodward Reply, Doc. 35.

[41]  *See also* Charles Alan Wright & Arthur R. Miller, 5B Fed. Prac. & Proc. Civ. § 1353 (3d ed.) (explaining that an appropriate basis for a Rule 12(b)(5) motion would be any "failure to comply with the procedural requirements in the applicable service provisions").

state law procedures. On a Rule 12(b)(5) motion, "the party asserting the validity of service bears the burden of proof on that issue."[42] Dismissal under Rule 12(b)(5) must be entered without prejudice.[43]

### B.      Rule 12(b)(6)

Under Rule 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[44] and *Ashcroft v. Iqbal*,[45] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[46]

The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[47]

---

[42]   *Allstate Ins. Co. v. Hewlett-Packard Co.*, 2016 WL 613571, at *2 (M.D. Pa. Feb. 16, 2016) (Kane, J.) (quoting *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 488 (3d Cir. 1993)).

[43]   *Umbenhauer v. Woog*, 969 F.2d 25, 30 n.6 (3d Cir. 1992).

[44]   550 U.S. 544 (2007).

[45]   556 U.S. 662 (2009).

[46]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

[47]   *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

## III.   ANALYSIS

### A.    Dismissal of the Six Corporate Defendants

As noted above, Woodward seeks the dismissal of the other six corporate entities named as Defendants.[48] Four of these entities are the same entities the Court found to be fraudulently joined and not properly served in its prior opinion (the "Fraudulently Joined Defendants"). The Chineas concede that the Fraudulently Joined Defendants should be dismissed but request dismissal without prejudice.[49] The Court will grant their request. Therefore, the Fraudulently Joined Defendants will be dismissed without prejudice.[50]

As for the remaining entities, termed the "POWDR entities," the Chineas contend they effectively served those entities by mail and suggest that if the Court disagrees, they should be given additional time to serve the POWDR Entities. They are incorrect on both counts.

Woodward argues that the Chineas' mailing of the FAC to the POWDR Entities' registered agents is ineffective.[51] Federal Rule of Civil Procedure 4(e)(1) allows service on a party using procedures prescribed by state law. Pennsylvania law

---

[48]   Woodward MTD, Doc. 27 ¶ 15; Woodward Br., Doc. 29 at 14-16.

[49]   Chinea Opp. Br., Doc. 33 at 4, 14-15.

[50]   Pennsylvania has a two-year statute of limitations on tort actions, such as those alleged in the FAC. *See* 42 Pa. C.S.A. § 5524. The Court notes—but does not decide—that even though it has dismissed the Fraudulently Joined Defendants without prejudice, the statute of limitations appears to have run on the Chineas' claims, which appear to have accrued in the summer of 2019 at latest.

[51]   Woodward Br., Doc. 29 at 15-16; Woodward Reply, Doc. 34 at 12.

allows service by mail in the first instance only when return receipt is requested.[52] The Chineas have provided the Court the letters they sent to the two POWDR Entities' registered agents, and neither indicates that return receipt was requested.[53] Therefore, the Court concludes that service was ineffective on the POWDR Entities.

Next, the Court proceeds in two steps to decide whether to extend the time in which the Chineas may serve the POWDR Entities. First, the Court "determines whether good cause exists for [the Chineas'] failure to effect timely service."[54] "If good cause exists, the extension must be granted."[55] If it does not, the court "must consider whether to grant a discretionary extension of time."[56] In considering a discretionary extension, the Court's "primary focus is on the [Chineas'] reasons for not complying with the time limit in the first place."[57]

Despite stating in their Opposition Brief that "the fair and just remedy is to find that good cause exists" to allow them to cure their ineffective service, the Chineas do not identify a reason for not complying with Rule 4.[58] Therefore, the Court concludes that good cause does not exist to allow the Chineas more time to serve the POWDR Entities.

---

[52]  Pa. R.C.P. No. 403.

[53]  *See* Docs. 33-7, 33-8.

[54]  *Boley v. Kaymark*, 123 F.3d 756, 758 (3d Cir. 1997).

[55]  *Id.* (citing *Petrucelli v. Bohringer and Ratzinger*, 46 F.3d 1298, 1305 (3d Cir. 1995)).

[56]  *Id.* (citing *MCI Telecomm. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1098 (3d Cir. 1995)).

[57]  *Id.* (citing *MCI Telecomm. Corp.*, 71 F.3d at 1097).

[58]  For instance, a defendants' evasion of service or concealment of defects in service may serve as good cause. *See Petrucelli*, 46 F.3d at 1205. But the facts here do not support either of those two bases.

As to whether the Court should, in its discretion, allow the Chineas more time, the Court notes that Woodward, in support of its opposition to the Chineas' Motion to Remand, provided unchallenged evidence that the POWDR Entities have no assets, no employees, and no relationship to the facts of this case.[59] Woodward itself claims to have "solely and continuously owned and operated the Woodward Camp continuously since July 2011," seven years before the facts alleged in the FAC occurred.[60] Therefore, the Court's refusal to extend time will not prejudice the Chineas, who have already sued and properly served the correct Defendant.

Furthermore, the Chineas were on notice of their ineffective service of the POWDR entities as early as January 25, 2022, when Woodward removed this case to this Court.[61] The Chineas argue that Woodward can accept service for the POWDR Entities.[62] But Woodward has no obligation to do so. The Chineas are "responsible for having the summons and complaint served within the time allowed by Rule 4(m)."[63] They failed to do so. For those reasons, the Court will elect not to extend the Chineas' time to properly serve the POWDR Entities. The POWDR Entities are accordingly dismissed from this matter without prejudice.

---

[59] Woodward Reply, Doc. 34 at 12 (citing Decl. of Morgan Williams, Doc. 27-2 ¶¶ 9-10 (explaining that the POWDR Entities have no assets, no revenue, no employees, and no operations)

[60] Decl. of Morgan Williams, Doc. 27-2 ¶ 7.

[61] *See* Notice of Removal, Doc. 1 ¶¶ 3-4 (explaining that entities other than Woodward were not properly served).

[62] Chinea Opp. Br., Doc. 33 at 15.

[63] Fed. R. Civ. P. 4(c).

### B.     Whether Woodward Can Be Held Vicariously Liable for Singer's Conduct

In moving to dismiss Count IV (vicarious liability) of the FAC, Woodward argues that Singer's acts fall outside the scope of his employment such that it cannot be held vicariously liable for his conduct.[64] The Chineas respond that Singer's actions fall within the scope of his employment, as he inappropriately touched S.C. while assisting her in performing a gymnastics routine.[65] The Chineas rely heavily on *Nardella v. Dattilo*, an *en banc* decision of the Court of Common Pleas of Dauphin County, which is where the Court will begin.[66]

In *Nardella*, the defendant, a Catholic priest, was counseling the plaintiff, whose mother had just died.[67] Through their weekly counseling sessions—which occurred on church property—the plaintiff and defendant began a sexual relationship.[68] The plaintiff attempted to end the relationship, but the defendant continued to pursue her.[69] Eventually, the plaintiff sued the diocese that employed the defendant on vicarious liability theory.[70] Her complaint alleged IIED and other torts arising from the sexual relationship between the plaintiff and the defendant.[71]

---

[64]   Woodward Br., Doc. 29 at 7-11.
[65]   Chinea Opp. Br., Doc. 33 at 5-10.
[66]   36 Pa. D. & C.4th 364 (Dauphin Cty. Pa. Com. Pl. 1997) (en banc).
[67]   *Id.* at 365.
[68]   *Id.* at 366-67.
[69]   *See id.* at 367-68.
[70]   *Id.* at 369.
[71]   *Id.*

The *Nardella* court began with the boundaries of a principal's vicarious liability for its agent's intentional acts, noting that "in cases where the 'agent acts in his own interest which is antagonistic to that of his principal, or commits a fraud for his own benefit in a manner which is beyond the scope of his actual or apparent authority or employment, the principal who has received no benefit therefrom will not be liable for the agent's tortious act.'"[72] The court then applied the Restatement's four-factor test to distinguish actions taken in the course of one's employment, which provides that an act occurs in the scope of employment if:

(1) it is of a kind and nature that the employee is employed to perform;

(2) it occurs substantially within the authorized time and space limits;

(3) it is actuated, at least in part, by a purpose to serve the employer; and

(4) if force is intentionally used by the employee against another, it is not unexpected by the employer.[73]

The *Nardella* court noted the substantial nexus between the defendant's actions and his employment: the alleged abuse occurred in the course of a relationship the defendant entered as an employee of the diocese.[74] It concluded that a jury could find that the diocese hired the defendant in part to counsel persons like the plaintiff, that all of the conduct occurred on church property during "regular

---

[72] *Id.* at 377 (quoting *Solomon v. Gibson*, 615 A.2d 367, 371 (Pa. Super. Ct. 1992)).

[73] *Id.* (quoting Restatement (Second) of Agency § 228 (1958)). This is the same test the parties ask the Court to apply in this matter. *See* Woodward Br., Doc. 29 at 8; Chinea Opp. Br., Doc. 33 at 6.

[74] *Nardella*, 36 Pa. D. & C.4th at 377.

hours," and that the defendant "acted in part, to serve his employer by facilitating [the] plaintiff's return to the Catholic church."[75]

Woodward points out that *Nardella* does not appear to be an accurate application of Pennsylvania law.[76] Subsequent decisions by Pennsylvania appellate courts support Woodward's argument to some degree, but the matter is not without doubt. Woodward first cites *R.A. ex rel. N.A. v. First Church of Christ*, in which the Superior Court of Pennsylvania concluded that a priest who sexually abused a child was not acting in the scope of his employment.[77] But the court noted that none of the abuse occurred in the priest's place of employment and that the priest specifically disclaimed to be the child's "spiritual advisor."[78] Here, nearly all of the alleged abuse

---

[75]  *Id.* at 377, 378. The Honorable Thomas I. Vanaskie confronted a similar situation when he wrote for this Court as Chief Judge in *Patel v. Himalayan International Institute of Yoga Science and Philosophy of the USA*, 1999 WL 33747891 (M.D. Pa. Dec. 9, 1999). In *Patel*, the Court held vicariously liable a yoga institute for the actions of its principal. *Id.* at *9. The principal, serving as the institute's chief spiritual advisor, engaged in a sexual relationship with one of his students as "part of his therapeutic regimen," which was sufficient to support the jury's finding that the institute was vicariously liable for its principal's intentional acts. *Id.* The Court today does not suggest that a plaintiff need allege facts similar to the exceptional facts of *Patel*; nor does *Patel* control this matter. But distinguishing intentional acts that are outside the scope of employment from those in within the scope in close relationships like those between a spiritual advisor and a student, or a coach and an athlete, is no easy task.

[76]  Woodard Reply, Doc. 34 at 4-5 (citing *Doe v. Pa. State. Univ.* 982 F. Supp. 2d 437, 443 n.8 (E.D. Pa. 2013) (concluding that *Nardella* is an "aberration from the general rule in Pennsylvania that outrageous sexual misconduct is outside the scope of employment."); *Tell v. Roman Catholic Bishops of Diocese of Allentown*, 2010 WL 1691199, at *11 (Del. Super. Ct. Apr. 26, 2010) (concluding that "*Nardella's* vicarious liability analysis 'does not . . . seem to be the law in Pennsylvania. *Nardella* has never been cited with approval by any court.'")

[77]  748 A.2d 692, 700 (Pa. Super. Ct. 2000).

[78]  *Id.* The court later noted without any analysis that the priest's conduct "was outside the scope and nature of his employment." *Id.*

happened on Woodward's property and during gymnastics training in a coach-trainee context, which is exactly what Woodward employed Singer to do.

Woodward next relies on *Hutchinson v. Luddy*, which involved a negligent hiring claim against a diocese for one of its priests' repeated abuse of a minor whom the priest counseled.[79] The majority relied on a different section of the Restatement of Agency that imposed liability on an employer for its employees acts outside of the scope of employment under certain conditions.[80] The court noted—without any analysis beyond a "mere application of common sense"—that the priest's abuse occurred outside the scope of his employment.[81]

The complication in this matter lies in the fact that Singer committed one action that arguably both served and did not serve Woodward's interests. Obviously, coaching a minor in gymnastics involves significant physical interaction, just as a priest spiritually advising a parishioner may involve significant emotional interaction. Some actions, such as Singer's alleged digital penetration of S.C., are clearly over the line. But others, such as Singer's grabbing S.C.'s buttocks, are more difficult to parse because they may be entirely consistent with coaching and with abuse. The distinction lies in intent—a difficult concept to assess on a pre-discovery motion to dismiss. Here, however, the Chineas allege that Singer's actions, including

---

[79]  683 A.2d 1254, 1256 (Pa. Super. Ct. 1996).
[80]  *Id.* (citing Restatement (Second) of Agency § 317 *Duty of Master to Control Conduct of Servant*).
[81]  *Id.*

grabbing S.C.'s buttocks, were improper.[82] As the Court must take those allegations as true, it must consider Singer's actions improper and accompanied by malintent. Accordingly, those actions cannot be said to have served Woodward's interests.[83] Therefore, Woodward's Motion to Dismiss is granted with respect to Count IV.

## C.   Whether Count VI Sufficiently Alleges an IIED Claim

Shulman and Woodward together argue that Count VI (IIED) must be dismissed because their conduct was not sufficiently outrageous.[84] Woodward also argues that the Chineas fail to satisfy the intent requirement.[85] Unsurprisingly, the Chineas disagree. They view Defendants' conduct as sufficiently outrageous and reckless, if not intentional.[86]

To recover on an IIED claim, a plaintiff must satisfy four elements: (1) "the conduct must be extreme and outrageous"; (2) "the conduct must be intentional or reckless"; (3) "it must cause emotional distress"; and (4) "the distress must be severe."[87] As noted above, Woodward disputes both the first and second elements; Shulman disputes only the first.

---

[82] *See* Compl., Doc. 5 ¶¶ 44-45.

[83] *See* Restatement (Second) of Agency § 231 Criminal or Tortious Acts ("The master can reasonably anticipate that servants may commit minor crimes in the prosecution of the business, but serious crimes are not only unexpectable but in general are in nature different from what servants in a lawful occupation are expected to do.").

[84] Woodward Br., Doc. 29 at 11-13; Shulman Br., Doc. 28 at 7-9.

[85] Woodward Br., Doc. 29 at 7-11.

[86] Chinea Opp. Brs., Doc. 32 at 5-8, Doc. 33 at 11-14.

[87] *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d. Cir. 1979) (citing Restatement (Second) of Torts § 46). In *Chuy*, the Third Circuit noted that although the Supreme Court of Pennsylvania "ha[d] not as yet specifically adopted in its entirety the Restatement's formulation and comments, Pennsylvania courts have signaled their acceptance

### 1.    Whether Defendants' Conduct was Outrageous

The Court first discusses whether Defendants' conduct was outrageous. The outrageous conduct required to support an IIED claim must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[88] "[C]onduct that deserves the label 'outrageous' is outrageous precisely because it tends to produce distress in normally constituted persons."[89]

A determination of outrageous conduct is fact-sensitive and not best resolved as an issue of law.[90] But the Court must make the initial determination regarding the sufficiency of a plaintiff's allegations.[91] Where reasonable minds differ, the determination is for the jury.[92] In line with their approach to IIED generally, Pennsylvania courts have adopted a narrow view of outrageous conduct and have

---

of this evolving tort," and applied Section 46 of the Restatement of Torts. *Chuy*'s statement of Pennsylvania tort law is as true today as it was in 1979, when it was decided. Aside from addressing issues of proof, *see Kazatsky v. King David Meml. Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987) (holding that IIED plaintiffs must present competent medical evidence of their damages) *Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652-53 (Pa. 2000) (holding that to recover for IIED, a plaintiff had to be present for the injurious conduct), the Supreme Court of Pennsylvania has not formally recognized the tort and Pennsylvania's intermediate appellate courts have narrowly construed it; the Court has found only one appellate case permitting recovery. *See Hoffman v. Meml. Osteopathic Hosp.*, 492 A.2d 1382 (Pa. Super. Ct. 1985). The Court further discusses *Hoffman* below.

[88] *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

[89] *Hackney v. Woodring*, 622 A.2d 286, 290 (Pa. Super. 1993), *rev'd on other grounds*, 652 A.2d 291 (Pa. 1994).

[90] *See Kazatsky*, 527 A.2d 196 (noting "subjectiveness of the Restatement's concept of 'outrageousness'").

[91] *Chuy*, 595 F.2d at 1274.

[92] *Id.* at 1274 n.9 (quoting Restatement (Second) of Torts § 46 cmt. h).

repeatedly emphasized its rarity.[93] Aside from *Chuy*, there are few cases concluding

that conduct was sufficiently outrageous as to permit recovery on an IIED claim.[94]

Of those, only one permitted recovery, but like *Chuy*, it had a significantly different

procedural posture and its facts have little relevance to this matter.[95]

Defendants appear to argue that they cannot be held liable for IIED because

in cases involving sexual abuse, only the perpetrator may be held liable.[96] However,

the cases they cite appear to involve efforts by organizations to cover up abuse by

their employees or the organizations' failure to reasonably investigate claims of

abuse.[97] In particular, Defendants rely on *M.S. ex rel. N.S. v. Twin Valley School*

*District*, where the court dismissed the plaintiff's IIED claim in part because the

---

[93] *See, e.g.*, *Kazatsky*, 527 A.2d at 991 ("The availability of recovery under section 46 is highly circumscribed."); *John v. Philadelphia Pizza Team, Inc.*, 209 A.3d 380, 383-84 (Pa. Super. Ct. 2019) (holding that repeated use of racial epithets not outrageous conduct) (citing *Dawson v. Zayre Dept. Stores*, 499 A.2d 648, 648 (Pa. Super. Ct. 1985) (same)); *Strain v. Ferroni*, 592 A.2d 698, 703 (Pa. Super. 1991) (holding that obstetrician's statement "'if you lose it, you lose it,' with reference to [plaintiff's] unborn child" was insufficiently outrageous).

[94] *Johnson v. Caparelli*, 625 A.2d 668, 672 (Pa. Super. Ct. 1993) (finding outrageous sexual abuse of a minor by a priest was outrageous but denying parents' recovery because they were not present for outrageous conduct); *Hackney*, 622 A.2d at 287-90 (finding outrageous defendant's repeated unwanted physical advances, including one instance of forcing himself upon plaintiff, but reversed for plaintiff's lack of expert evidence regarding her injuries).

[95] In *Chuy*, a Philadelphia Eagles staff physician informed the press that a football player set to retire due to health issues was suffering from a fatal disease when the physician knew that the player was not suffering from the disease. 595 F.2d at 1274. The Court of Appeals concluded that such an allegation was sufficient to state a claim for IIED and upheld the jury's verdict. *Id.* In *Hoffman*, the court upheld a verdict in favor of a plaintiff who presented at an emergency room with serious symptoms, and was told that there was nothing wrong with him and he should go home. *Id.* at 1385. As the plaintiff remained on the floor of the hospital, the defendant physician stepped over him, and refused assistance for approximately two hours. *Id.*

[96] *See* Shulman Br., Doc. 28 at 7-8; Woodward Br., Doc. 29 at 11-12.

[97] Shulman Br., Doc. 28 at 9 (citing *Doe v. Allentown Sch. Dist.*, 2007 WL 2814587, at *10 (E.D. Pa. Sep. 24, 2007); Woodward Br., Doc. 29 at 11-12 (citing *M.S. ex rel. N.S. v. Twin Valley School District*, 2016 WL 11698061, at *8 (E.D. Pa. June 14, 2016)).

plaintiff alleged only a failure to investigate his claims, which the court did not find sufficiently extreme as to be outrageous.[98]

Here, the Chineas do allege that Defendants failed to investigate S.C.'s claims.[99] But they go further. They identify Shulman as having "secluded S.C. alone in a conference room," interrogating her, challenging her credibility, and advising her "not to ruin Singer's reputation and to stop spreading rumors."[100] Shulman "also threatened that if [S.C.] continued to talk about Singer's assault that it would wreck her chance of being a gymnast in college."[101] Further, the FAC alleges that "other coaches and staff at Woodward" knew about and were concerned about Singer's behavior and had repeatedly raised it to Shulman and other camp administrators.[102] Those actions are not merely the failure to reasonably investigate complaints of abuse.

The Chineas emphasize the power differential between Woodward and S.C.[103] The Court agrees. The Restatement explains that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position," such as the position a youth camp director holds when supervising minor campers.[104] Indeed,

---

[98]  *See M.S.*, 2016 WL 11698061, at *8; *accord Allentown Sch. Dist.*, 2007 WL 2814587, at *10 (dismissing IIED claim because the "plaintiffs [did] not allege that the defendants, even if they covered up the assaults, did so with the intention that more children would be injured").

[99]  FAC, Doc. 5 ¶ 75.

[100] *Id.* ¶ 60.

[101] *Id.*

[102] *Id.* ¶ 66.

[103] Chinea Opp. Brs., Doc. 32 at 5-6, Doc. 33 at 12.

[104] *See* Restatement (Second) of Torts § 46 cmt. e.

the Chineas allege that Shulman and other Woodward employees, as youth camp administrators, are mandatory reporters of child abuse under Pennsylvania law.[105] As such, they had a professional obligation to report Singer's alleged abuse.[106] Moreover, Pennsylvania law criminalizes the intimidation or attempted intimidation of anyone attempting to report child abuse.[107] Although outrageous conduct goes beyond that which is criminal, tortious, or malicious; indeed, it must be "utterly intolerable in a civilized community"—but the Court may consider the fact that such intimidation is a crime.[108]

But even beyond the general child-adult power dynamic or Pennsylvania law on mandatory reporting, Woodward has trained Olympian gymnasts and has an experienced coaching staff—all people that fourteen-year-old S.C. likely trusted and also looked up to as role models.[109] The FAC alleges that Defendants flagrantly abused S.C.'s trust. The FAC paints a picture in which Defendants—despite their knowledge of Singer's pattern of abusive behavior—rejected the allegations of a teenage gymnast under their sole supervision and attempted to procure her silence by using tactics normally employed by law enforcement officers interrogating

---

[105] *Id.* ¶ 63.

[106] *See* 23 Pa. C.S. § 6311(a)(7) (requiring "[a]n individual, paid or unpaid, who, on the basis of the individual's role as an integral part of a regularly scheduled program, activity or service, is a person responsible for the child's welfare or has direct contact with children" to report suspected child abuse); *see also* § 6311(a)(5).

[107] *See* 18 Pa. C.S. § 4958.

[108] *See Chuy*, 595 F.2d at 1274 (quoting Restatement (Second) of Torts, § 46, comment d).

[109] *See* Compl. Doc. 5, ¶¶ 4-6.

suspected criminals, including threats about her future. A jury could reasonably conclude that such conduct is intolerable in our society.

### 2. Whether Defendants' Conduct was Intentional

In addition to showing that a defendant's conduct was outrageous, a plaintiff must also show that the defendant acted intentionally to recover for IIED. The Restatement of Torts provides that an individual can be held liable for IIED if he or she "desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct."[110] An individual can also be held liable for acting recklessly.[111]

The Restatement recognizes two forms of recklessness, both of which are measured objectively: (1) when the actor knows, or has reason to know, of facts that create a high degree of risk of physical harm to another and deliberately acts in conscious disregard or indifference to that risk; and (2) when the actor knows or has reason to know of the same facts, but fails to appreciate the risk where a reasonable actor would.[112]

Woodward argues that the FAC fails to allege that it "acted with any intent to cause or inflict any emotional distress on S.C., or any other individual."[113] It again

---

[110] Restatement (Second) of Torts § 46 cmt. i.

[111] *Id.*

[112] *Id.* § 500.

[113] Woodward Br., Doc. 29 at 12; *accord* Woodward Reply, Doc. 34 at 7-8 ("There are no allegations in the [FAC] that [Woodward] acted maliciously or intentionally." (internal quotation marks omitted)).

relies on *M.S.*, in which the other basis for the court's dismissal of the plaintiff's IIED claim was his failure to allege that the defendant intended to cause the plaintiff more harm by failing to investigate his complaints of abuse.[114]

As the Chineas seize upon, Woodward's argument ignores the fact that IIED can be premised on reckless conduct without any specific intent to harm others. The actor need only have the knowledge to appreciate the risks involved. Here, the staff at Woodward knew that S.C. was a child, that she was hundreds of miles from home, and that she did not have her parents with her. Furthermore, they had at least some reason to believe she was telling the truth, given the FAC's allegation that staff had raised concerns about Singer's behavior before 2018.

From its knowledge and actions, a jury could reasonably infer that Woodward's acted recklessly.[115] The FAC certainly alleges that S.C. suffered harm as a result of *both* Singer's conduct and Woodward's response.[116] A jury might also be able to infer intent from Woodward's actions, but the inference of recklessness is

---

[114] 2016 WL 11698061, at *8 (E.D. Pa. June 14, 2016); *accord Allentown Sch. Dist.*, 2007 WL 2814587, at *10 (dismissing IIED claim because the "plaintiffs [did] not allege that the defendants, even if they covered up the assaults, did so with the intention that more children would be injured").

[115] A jury may also be able to infer an intent to harm from these actions,

[116] Compl., Doc. 5 ¶ 71 ("The negligence, recklessness, and outrageous conduct of Defendant Nathanial Singer, Defendant Shulman, and the Woodward Camp Defendants and their agents and/or employees was a factual cause of S.C.'s harm . . . .").

sufficient to survive a motion to dismiss. Therefore, Defendants' Motions to Dismiss are denied with respect to Count VI.[117]

## IV.   CONCLUSION

For the foregoing reasons, the Fraudulently Joined Defendants are dismissed from this matter without prejudice as per the Chineas' request. The POWDR Entities are also dismissed from this matter due to the Chineas' failure to properly serve them. The remaining Defendants are therefore Singer, Shulman, and Woodward. Furthermore, Count IV (vicarious liability), is dismissed because Singer's intentional acts are not in the scope of his employment at Woodward.

But Defendants' Motions to Dismiss are denied with respect to Count VI (IIED). Defendants acknowledge the reprehensible nature of the allegations but suggest that such "manipulation" of a minor child is not outrageous.[118] The Court disagrees. It is manifestly clear that in Pennsylvania and elsewhere, sufficient allegations of outrageous conduct are rare. But they are present here.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[117]   Defendants are invited to renew their arguments if discovery sheds further light on what happened in 2019. As noted above, such allegations are difficult to assess without the benefit of any discovery.

[118]   Shulman Br., Doc. 28 at 8.